UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:21 CR 580 AGF / DDN |
| ) | |
| MICAH GORDON, ) | |
| ) | |
| Defendant. ) | |

**ORDER AND RECOMMENDATION**

This action is before the Court on the pretrial motions of the parties that were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b).  Pending[1] are the motions of defendant Micah Gordon to suppress evidence (Docs. 41, 82, 83, and 88) and of the government for a determination of the admissibility of its arguably suppressible evidence (Doc. 42).  An evidentiary hearing was held on these motions on September 7, 2022; a transcript of the hearing was filed on September 19, 2022. (Doc. 115.)  The parties thereafter filed post-hearing memoranda.  (Docs. 120, 121.)

By superseding indictment, defendants Micah Gordon and Kevin Cunningham are charged in Count 1 with conspiring on October 13, 2021, to use a facility of interstate commerce to commit a murder, in violation of 18 U.S.C. §§ 2 and 1958(a); 14 enumerated overt acts are alleged.  Both defendants are also charged in Count 2 with possessing a firearm on October 13, 2021, in furtherance of the drug trafficking crime of conspiring to

---

[1] On July 30, 2022, the undersigned filed a Report and Recommendation regarding pretrial motions of defendant Gordon to sever (Doc. 81), to dismiss Count 1 of the superseding indictment (Doc. 85), for disclosure of certain evidence (Doc. 84), for disclosure of Jencks Act material (Doc. 86), and for disclosure of confidential sources (Doc. 87).  *See* Doc. 102.  Defendant filed his objection to the R & R (Doc. 107) to which the government has responded (Doc. 108).

possess fentanyl with the intent to distribute, in violation of 18 U.S.C. § 924(c)(1)(A). (Doc. 56.)

Upon consideration of the evidence adduced during the hearing and considering the arguments of the parties, the undersigned makes the following findings of fact and conclusions of law.

## FACTS

1. a. During October 2021, St. Louis County Police Detective Kevin Walsh[2] participated in an investigation of Kevin Cunningham and Micah Gordon. Cunningham had been a defendant in an earlier DEA investigation. In that month, a confidential source ("CS-1") in Texas[3] told federal authorities about a murder-for-hire plot developing in Mexico and Texas.

b. CS-1 stated he/she was contacted by an individual in a drug trafficking organization named Victor Coral Nunez who told CS-1 that there was potential work for CS-1. Nunez told CS-1 that a man in St. Louis[4] was owed over $120,000 in drug trafficking proceeds by a certain person ("drug money debtor" or "debtor"). The drug money debtor was also causing problems for the person to whom he owed the money. Nunez told CS-1 to contact a woman in Mexico for more information. CS-1 did so and the woman told CS-1 that the debtor was causing problems for her "black man in St. Louis."[5] The woman said this black male had worked for her for several years and owes her money. She also said

---

[2] Det. Walsh has been assigned for one year to the Bureau of Drug Enforcement and works with the federal Drug Enforcement Administration ("DEA") as a Task Force Officer. In that capacity he participates in investigations of large and small drug trafficking organizations. His earlier assignment was with the St. Louis County Police Criminal Intelligence Unit, whose duties included investigating drug trafficking organizations, criminal street gangs, and homicides. His law enforcement training included programs conducted by the DEA, the Federal Bureau of Investigation, and the St. Louis County Police Department.

[3] This investigation involved the DEA offices in St. Louis and El Paso, Texas.

[4] This man in St. Louis was later identified as defendant Kevin Cunningham.

[5] *See* footnote 4.

that he had been trying to collect over $120,000 in drug trafficking proceeds from an individual in St. Louis who is causing problems.

        c.        CS-1 also told the federal authorities that this woman gave him the phone number (314-xxx-5976) of her black male associate in St. Louis so CS-1 could contact him, which he did. The woman's associate in St. Louis was Kevin Cunningham to whom the debtor owed the drug trafficking proceeds. On October 7, CS-1 contacted Cunningham through the -5976 phone number. For CS-1 and Cunningham to understand each other a Spanish interpreter was used to translate between the two. Cunningham told CS-1 about the large debt owed to him and that the debtor was causing large-scale problems by not paying and by shooting at Cunningham. Cunningham told CS-1 the debtor should be kidnapped and "the problem taken care of."

        d.        During this phone conversation, CS-1 and Cunningham agreed to meet in St. Louis. Cunningham said he would provide CS-1 with "toys," meaning firearms for accomplishing the murder-for-hire of the drug money debtor. They agreed to meet in St. Louis on October 13, 2021. Cunningham asked CS-1 to bring another person with him to accomplish the murder. CS-1 brought another cooperating source with him, CS-2.

    2.    a.    On October 7, 2021, shortly after the phone call between CS-1 and Cunningham, DEA Special Agent Christopher Eaves in St. Louis applied to this District Court for a search warrant to AT&T for digital precision location information and information developed from pen register and trap and trace devices, for telephone number 314-xxx-5976 ("subject cellular telephone number"). *See* Case No. 4:21 MJ 7235 SPM. The primary purpose of the warrant was to locate Cunningham through his cell phone's location.

        b.        In support of the search warrant, Agent Eaves submitted his sworn, written affidavit that described the investigation of Kevin Cunningham in the murder-for-hire matter as an extension of the investigation that led to Cunningham's fentanyl trafficking charges in this Court.[6] The affidavit stated that on September 28, 2021, a DEA

---

[6] *See* Case No. 4:20 CR 178.

confidential source, identified in the affidavit as "CS,"[7] told federal investigators that investigation target Victor Manuel Corral-Nunez, a member of a Mexican drug cartel, wanted CS to collect $120,000 (believed to be drug trafficking proceeds) from an unnamed person in St. Louis who did not want to pay.  On October 5, 2021, Nunez gave CS the phone number in Mexico of a woman who had more information about the St. Louis drug money debtor.  Later on October 5, CS spoke with this woman in a conversation that was consensually recorded by federal investigators.  In the conversation, quoted in Agent Eaves's affidavit, the woman told CS about a "'Black Man' who works for me for a long time and he has a couple of weeks battling it out with this associate or friend, let's put it that way, who has filled himself with trash and has gone crazy." (No. 4:21 MJ 7235 at 9.) The woman stated that this associate of the black man not only owed him money but has tried to shoot at him.  So, the woman's associate "has called on us to ask for help and asks for two guys to go.  He would be the one to receive them, give them transportation, give them the 'toys' that they need, . . . then be in charge of putting him down, and then they go back to where they are from.  Obviously he pays them first and then they leave.  So he is looking for two guys who are not from that area." (*Id.*)

        c.      Agent Eaves's affidavit also stated that in the October 5, 2021 consensually recorded conversation the Mexican woman gave CS the subject cellular phone number of her associate in St. Louis who wanted action regarding his drug money debtor.  (*Id.* at 11.)

        d.      The affidavit also stated that a subpoena was issued to AT&T for subscriber information regarding the subject cellular phone number.  The responsive information was that the number was subscribed by Tequila Holmes at 3833 Osceola in St. Louis.  During the winter of 2020, Cunningham was intercepted communicating with drug trafficking associate Jamore Clark using a phone number then subscribed by Tequila Holmes at the same Osceola address.  Investigation indicated that Cunningham is associated with the subject cellular phone number.

---

[7] From the record the undersigned finds that this CS is CS-1 who is discussed in these findings of fact.

4

  e. The affidavit also stated that later on October 5, 2021, CS called the subject cellular phone number and discussed with Cunningham and an unidentified male the kidnapping and murder of the debtor.  The location, a meeting with Cunningham, and the "toys" were also discussed.

  f. Agent Eaves's affidavit requested precision location information be provided to the investigators by AT&T to locate Cunningham and to monitor his activity in the surveillance the investigators would conduct during their investigation.  (*Id.* at 16.)

  g. On October 7, 2021, at 5:33 p.m., Magistrate Judge Shirley P. Mensah signed the warrant for production of the information sought.  (*Id.,* Doc. 3 at 1.)

  3. a. For the October 13, 2021 meeting in St. Louis, with police assistance, CS-1 rented a room in the Drury Inn in north St. Louis County.  CS-1 and CS-2 met Cunningham in that hotel room.  Cunningham had driven his truck there with passengers Micah Gordon and Wesley Taylor.  This was the first time the investigators learned of Gordon or his involvement.[8]  When Cunningham drove into the hotel parking lot, Det. Walsh and the investigators were receiving GPS precise location data from AT&T from the execution of the search warrant for Cunningham's phone number.

  b. Cunningham and Gordon got out of the truck and entered the hotel, leaving Taylor in the truck.  When Cunningham and Gordon entered the hotel room, Cunningham immediately sat down.  Cunningham told the two CSs that he was owed over $120,000 by the individual causing serious problems for him that included not only the debt but also violence directed to Cunningham.  Cunningham (with Gordon sitting next to him and participating to some extent in the conversation by primarily nodding his head) told the CSs that "toys" would be provided, including rifles.  Cunningham also told the CSs he would provide them with the identity and a photo of the problematic debtor and also a location for the kidnapping to occur.  Also discussed was torture to get the debtor to pay the money, before the CSs killed him.  Cunningham said he did not want the debtor to come back after being kidnapped.

---

[8] For this meeting, law enforcement had set up audio-video surveillance and recording equipment outside the hotel building and inside the meeting room.

  c. In this conversation, there was some confusion over who would pay each of the CSs $5000 for this business.  The CSs said they thought Cunningham would pay; Cunningham thought the Mexican source would pay.

  d. At the end of the meeting, Cunningham told the CSs they would hear from him or Gordon in the near future and they would get a photo of the target and the location.  The group also discussed that they would need several ammunition magazines and that Cunningham would have someone pick up the CSs and drive them past the location for the kidnapping.  The group agreed to meet again later that evening at a MotoMart at Interstate Highway 270 and Riverview Blvd.

 4, After the hotel meeting, police surveillance followed Cunningham's truck for several hours as it traveled on Harney, near Kingshighway, then to an alley at 5324 Queens, then to 4944 Ashby, with people getting in and out.  During this period, an unknown phone number was used to send to the CSs' phone the location of 5324 Queens and a photo of the intended victim.  After Cunningham's truck had been at the Ashby location, Cunningham drove it, with Wesley Taylor and Micah Gordon still in it, to 610 Prigge near Riverview.  The CSs were then directed to go to that location, which they did.

 5. Cunningham drove his pickup truck with Gordon and Taylor into the parking lot at Prigge and Riverview.  The CSs drove in with their vehicle and stopped next to Cunningham's truck.  CSs exited their vehicle and walked to the truck.  One CS walked to the rear passenger door where Micah Gordon handed the CS a large object, later determined to be several firearms wrapped in blankets.[9]  Cunningham handed money to the other CS.  Then, the CSs returned to their vehicle and drove away.  Shortly thereafter, the CSs told the officers that they had been given weapons by Gordon and Cunningham.

 6. After this meeting, Cunningham, Gordon, and Taylor drove away.  They headed south on Riverview, over I-270, towards the City of St. Louis.  About a mile ahead of Cunningham's vehicle, after learning from the CSs that they had received weapons,

---

[9] In his post-arrest interview, Gordon admitted handing the CS the weapons.

6

officers deployed spike strips in case Cunningham attempted to avoid the intended police stop,[10] which is what happened.

7. When the officers attempted to stop Cunningham's vehicle, he failed to yield and stop, but instead drove across the spike strips. As the truck was driven down Riverview officers saw what looked like either a cell phone or a firearm being thrown from the vehicle into nearby foliage.[11] Officers continued to follow the truck as it turned west onto Valley Drive for several hundred feet before it was disabled and Cunningham pulled over. Officers approached the truck and commanded the occupants to exit it. When no one inside the truck did so, "distractionary tactics" were used to prevent harm to law enforcement and bystanders; Gordon was removed from the rear seat and Cunningham from the driver's seat. Both were then handcuffed.

8. Gordon was placed against the hood of Det. Walsh's police car. When the officer asked Gordon for his identification, Gordon gave a false name. When this was learned, Walsh put him in the front seat of the police car.

9. Later, while still at the scene of the stop, Task Force Officer Merritt, the lead investigator of the operation, got into the police car with Walsh and Gordon. Merritt, first, without using any written waiver form, orally advised Gordon of his constitutional rights to remain silent and to counsel. Gordon did not then or at any time in the police vehicle invoke either of these rights. Officer Merritt asked Gordon what was thrown from the truck. Gordon said he was not sure; he thought Cunningham was the one doing the throwing. Gordon himself began asking the officer questions about what had happened. Officer Merritt told Gordon that they would have an in-depth conversation when they arrived at the DEA office. That was the end of the conversation in the police vehicle which was then driven to the DEA office.

---

[10] The officers did not attempt to make a traffic code violation stop to effect the arrests.

[11] In their investigation, the police looked for what had been thrown but the foliage was too dense to find anything.

10.     At the DEA office Cunningham and Gordon were detained.  After being interviewed, Wesley Taylor was released.

11.   a.      At the DEA office, Micah Gordon was booked and placed in an interview room which was equipped with audio and video recording equipment.[12]  Officer Merritt and two other officers interviewed Gordon.

   b.      The interview was conducted by three officers in plain clothes.  Each of the officers and Gordon sat in chairs around a small round table.  Officer Merritt began the interview by stating that they wanted to get to the bottom of the events that had transpired that day.  Gordon initially denied knowing anything about the facts underlying their investigation, explaining he had recently gotten out of federal prison, and had a family and a job.

   c.      Next, Officer Merritt reminded Gordon that he had been advised of his constitutional rights earlier in the police vehicle at the arrest scene.  Gordon acknowledged this.  Merritt then again read to Gordon his constitutional rights to remain silent and to counsel.  Several times during the interview Gordon said he understood his rights.  Gordon clearly understood his rights to counsel and to remain silent.

   d.      The interview proceeded with the officers repeatedly prompting Gordon to tell them the entire truth about what had happened.  Frequently during the interview Gordon gave narrative responses that were substantially longer than the officers' statements and questions.  Gordon told the officers that he did not want to return to prison and that what he was saying was true.

   e.      Throughout the two hour interview, Gordon always appeared to understand what was going on, he never appeared tired, he always appeared clear-headed, and he always was articulate.  He frequently referred to the officers as "bro."  No promise was ever made to induce him to cooperate and make statements.  The officers made it clear

---

[12] The custodial interview of Gordon was audio and video recorded and the recording was received into evidence during the suppression hearing as Government Exhibit 1.  The undersigned has watched to the recorded interview, which was approximately two hours long.

8

to Gordon that they had no authority to decide whether to release him or confine him.  They said they would report to the federal prosecutor about Gordon's responses to his arrest and being interviewed.  As Gordon learned that the officers knew more than he had been telling them, he became more frustrated that his statements were not persuasive, but he nevertheless continued to make statements to the officers.  At one point, a little after the interview was an hour old, Gordon stood up from his chair and with his hands on the table leaned down into the officers and spoke to them in a hushed tone.  When he did this, the officers never changed their demeanor, never told him to be seated, and never said anything until he finished and sat down on his own.

    f. At about an hour and 17 minutes into the interview, Gordon reminded the officers that he had even given them his cell phone.  The officers had Gordon's cell phone with them in Gordon's plain view during the interview, even displaying some contents to him.  At about an hour and 37 minutes into the interview, Officer Merritt presented Gordon with a one-page consent-to-search form for his cell phone.  He told Gordon that they believed he had earlier given them permission to look into his phone and asked him whether he would sign the form.  Gordon asked why he had to do so, after he had given them the phone.  The officer said it was a formality.  Again, Gordon stated he had given them the phone.  An officer said that, if Gordon didn't sign the form, they would apply for a search warrant for it.  The officer said that he wanted to ask Gordon's permission to go through the phone.  At about an hour and 49 minutes into the interview Gordon without compulsion or promises signed the form.

    g. At no time during the interview did Gordon invoke his right to remain silent or his right to counsel.  At no time during the interview did the officers coerce Gordon in any way.  Nor were any promises made to induce his cooperation.  After approximately an hour and 52 minutes, the interview ended and the officers led Gordon out of the interview room.

9

## DISCUSSION

### *Stop of Cunningham's truck and arrest of Gordon*

In his post-hearing memorandum defendant Micah Gordon argues first that the police did not have probable cause to arrest him in the "traffic stop" of the truck Cunningham drove on October 13, 2021. (Doc. 120 at 3.)  This argument is without merit.

This argument and another by defendant, discussed below, invoke the principles of the Fourth Amendment, which protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV.  To secure these rights, the Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.*  The linchpin of the Fourth Amendment is reasonableness. *E.g. United States v. Garges*, 46 F.4th 682, 685 (8th 2022).

The Supreme Court has long held that an arrest without a judicial warrant is reasonable and, thus, authorized by the Fourth Amendment if the police have probable cause, *i.e.* information sufficient to cause a reasonable person to believe that the defendant had committed an offense or was then committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *United States v. Czeck*, 105 F.3d 1235, 1238 (8th Cir. 1997) ("A warrantless arrest in a public place is valid if the arresting officer has probable cause") (approving Czeck's arrest in the car of another).  In Gordon's case, the police had substantial evidence that Gordon was involved or had become involved with Cunningham's plan to murder the drug money debtor because the police knew Gordon participated actively in the meeting with the CSs, thereafter drove around with Cunningham, and Gordon handed the wrapped firearms to one CS while Cunningham handed the other CS the money for the operation. The stop of Cunningham's truck was never a "traffic stop" based on a violation of motor vehicle laws.   It was based on probable cause to arrest both Cunningham and Gordon. Gordon's arrest was lawful.

### *Gordon's post-arrest statements*

The admissibility of post-arrest statements which resulted from police interrogation depends upon whether the defendant had been advised of his rights, as prescribed by *Miranda v. Arizona*, 384 U.S. 436 (1966); whether the defendant knowingly and voluntarily waived the *Miranda* rights, *North Carolina v. Butler*, 441 U.S. 369, 373, 375-76 (1979); and whether the statements were voluntary. Statements are voluntary, if they were not the result of government overreaching, such as coercion, deception, or intimidation, regardless of the mental condition of the defendant, such that the defendant's will was overborne. *Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986); *United State v. Jordan*, 150 F.3d 895, 898 (8th Cir. 1998), *cert. denied*, 119 S. Ct. 1153 (1999).

*Miranda* requires law enforcement officers to inform an arrested person (1) that he has the right to remain silent, (2) that his statements may be used against him at trial, (3) that he has the right to be represented by an attorney being present during an interrogation, and (4) that, if he cannot afford to hire an attorney, one will be appointed for him. *Miranda*, 384 U.S. at 474-76. The Court has found above that defendant was orally advised of his *Miranda* rights at the scene of the arrest, that he was orally advised of these rights again at the beginning of the custodial interview in the DEA office, and that in the DEA office defendant acknowledged being so advised.

Whether an interrogated person waived his *Miranda* rights depends upon two considerations:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. at 421. The undersigned has found as a fact that defendant never invoked his right to remain silent or his right to counsel. Instead, he personally chose

11

to speak with the officers. In fact, defendant spent most of the two-hour interview proactively attempting to persuade the officers that he was not involved in the matter under investigation so they would release him without prosecution. He persisted in this purpose even after the officers told him they did not believe what he was telling them. At no time did the officers coerce defendant or induce his statements by promising him relief of any kind, other than to tell the federal prosecutor what defendant's response to the arrest and an opportunity to cooperate was.

Defendant did not expressly waive his *Miranda* rights. However, the waiver of *Miranda* rights need not be explicit, but may be implied from the totality of the circumstances, including the "background, experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 373, 374-76 (1979) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). *See also Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). From defendant's repeated statements during the interview in the DEA office, he knew from his own criminal history and experience what he was doing and the potential consequences. He implicitly voluntarily and knowingly waived his rights to counsel and to remain silent.

Defendant Gordon's post-arrest statements should not be suppressed.

### *Digital precision location information*

Defendant argues that any evidence obtained by the government as a result of the AT&T search warrant for digital information (*see* Case No. 4:21 MJ 7235) should be suppressed. The government argues that defendant Gordon does not have standing to complain about it acquiring the precision location information for Cunningham's cell phone. The undersigned agrees. Defendant has not shown that he had an expectation of privacy in this information that is protectable under the Fourth Amendment. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *Minnesota v. Carter,* 525 U.S. 83, 88, 90-91 (1998).

A constitutionally protectible expectation of privacy is comprised of two elements: (a) a subjective expectation of privacy in the subject matter of the search and (b) that this expectation of privacy is objectively reasonable. *United States v. Douglas*, 744 F.3d 1065,

1069 (8th Cir. 2014). Relevant factors to be applied were stated by the Eighth Circuit Court of Appeals in *United States v. Russell*:

> [O]wnership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

847 F.3d 616, 618 (8th Cir. 2017) (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)).

The facts of the case are clear. Cunningham's cell phone was the subject of the warrant directed to AT&T. The government did not know of Gordon's involvement with Cunningham until he arrived with Cunningham in the truck for the hotel meeting. There has been no showing that defendant owned, used, or purchased the phone that was the subject of the warrant to AT&T. *United States v. Baker*, 2012 WL 12527307, at *9 (E. D. Mo. Sept. 29, 2012). Therefore, defendant Gordon has no standing to complain about the government's acquisition of the digital precise location information for Cunningham's phone. It is therefore unnecessary to decide whether the warrant was founded on probable cause. The digital precise location information ought not be suppressed.

## **CONCLUSION**

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the motion of the government for a determination by the Court of the admissibility of arguably suppressible evidence **[Doc. 42] is denied as mooted** by the filing of this Order and Recommendation.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Micah Gordon to suppress evidence **[Docs. 41, 82, 83, and 88] be denied.**

13

The parties they have **until December 5, 2022**, in which to file documentary objections to this Order and Recommendation. The failure to file a timely written objection may waive the right to appeal issues of fact.

<u>/s/ David D. Noce</u>
**UNITED STATES MAGISTRATE JUDGE**

Signed on November 16, 2022.